# EXHIBIT 5



## Zastrzeżenia do wystąpienia pokontrolnego Najwyższej Izby Kontroli z dnia 28 lipca 1998 r.

1. Zgodnie z postanowieniem Prezesa NIK przedmiotem kontroli miało być zbadanie „ zabezpieczenia interesów telewizji polskiej w umowie na kolportaż programu TV POLONIA w USA i Kanadzie". Tymczasem w wystąpieniu pokontrolnym zawarte są oceny realizacji umowy oparte o opinie osób postronnych, które w żaden sposób nie są kompetentne do dokonywania tych ocen. Z wystąpienia pokontrolnego wynika, że kontrola wyszła poza zakres postanowienia o przeprowadzeniu kontroli. Ponadto część dokumentów przedkładanych kontrolerom a dotyczących meritum kontroli nie znalazło odbicia w protokole kontroli i w wystąpieniu pokontrolnym.

2. Nieprawdziwe jest stwierdzenie w wystąpieniu pokontrolnym jakoby sygnał TV POLONIA nie był odbierany w Kanadzie. Zarówno na terytorium USA i Kanady sygnał był i jest odbierany w systemie niekodowanym. Na tę okoliczność dyrektor Biura Współpracy z Zagranicą TVP S.A. przekazał pisma wyjaśniające i udostępnił pisemne potwierdzenie tego faktu przez dyrekcję amerykańskiego systemu satelitarnego ORION / kopia pisma dyrekcji ORION-zał.nr .1/.

3. Niezrozumiałe jest stwierdzenie wystąpienia pokontrolnego, z którego wynika, że pomimo formalnie korzystnych warunków umowy była ona obarczona wieloma błędami i choć nie powodowała zobowiązań finansowych ze strony TVP S.A., to umożliwiała zrzucenie odpowiedzialności za niewywiązywanie się z realizacji umowy na stronę polską. Stwierdzenie to jest sprzeczne wewnętrznie, nielogiczne i nie poparte żadnymi konkretnymi przykładami zapisów umowy oraz faktów zaistniałych w toku jej realizacji.

4. Powoływanie się w wystąpieniu pokontrolnym na opinię Radcy Handlowego RP w Montrealu jako jedyną, która miałaby determinować decyzję Zarządu TVP S.A. w zakresie wyboru partnera umowy jest błędne, tym bardziej, że dyrektor BWZ przekazał kontrolerom opinie wywiadowni handlowej Dun and Bradstreet Canada /zresztą otrzymaną za pośrednictwem ▓▓▓▓▓▓▓▓▓▓- vice konsula w Montrealu z Biura Radcy Handlowego/ oraz opinię banku Royal Bank, którego klientem jest ▓▓▓▓▓▓ właściciel firmy SEI. Obie opinie w pozytywnym świetle stawiały firmę SEI jako potencjalnego partnera umowy. Przedstawione kontrolerom życiorysy właściciela SEI oraz członków Zarządów korporacji TVP USA i Kanada świadczą o ich dużym doświadczeniu w świecie mediów./zał.nr .2/ i przeczą tezie postawionej w wystąpieniu pokontrolnym mówiącej, że "główną przyczyną niezadawalającego stanu realizacji umowy jest fakt... braku

i

TP3000665

jakiegokolwiek doświadczenia firmy SEI w działalności takiego medium jak telewizja".

5. Zarzut wystąpienia pokontrolnego dotyczący braku zabezpieczenia kontroli TVP S.A. nad zawartością programu emitowanego w Ameryce z udziałem programu TV POLONIA jest chybiony merytorycznie, albowiem strony celowo dopuściły możliwość emisji własnych audycji przez SEI ze względu na handlowy charakter umowy, tzn. udział TVP S.A. w dochodach SEI z tytułu emitowania programu i reklam. Natomiast §5 i §9 ust.4 umowy w sposób ewidentny zabezpiecza integralność audycji TV POLONIA i uniemożliwia ingerowanie SEI w kształt i zawartość tego programu /np. niemożność przerywania audycji reklamami/.

6. Zarzut udzielenia wyłączności do odbioru i emitowania sygnału TV POLONIA dla firmy SEI jest bezzasadny, albowiem tylko firma SEI godziła się na pokrycie kosztów przekazu sygnału satelitarnego z Europy oraz zobowiązała się do jego emisji, będąc jednocześnie jedynym wiarygodnym partnerem /vide pkt.4 zastrzeżeń/. Pozostali oferenci przerzucali większą część kosztów tego przedsięwzięcia na TVP S.A. co z punktu widzenia naszej Spółki było nie do przyjęcia. Ponieważ przedsięwzięcie to jest niezwykle czasochłonne i kapitałochłonne /do dnia dzisiejszego, według SEI nasz partner zainwestował ok. 7 mln. dolarów USA/, czas trwania umowy był podstawowym warunkiem jej zawarcia, albowiem tylko taki czas i posiadanie wyłączności mogło w perpektywie gwarantować sukces przedsięwzięcia. Dla przykładu załączamy propozycję przedstawioną przez innego oferenta /zał.nr .3/. cytowanego przez kontrolerów księdza ▇▇▇▇▇▇▇▇▇▇▇▇.

7. Stwierdzenia wystąpienia pokontrolnego dot. utworzenia korporacji są stwierdzeniem faktu, który w żaden sposób nie odbiega od postanowień umowy.

8. Zarzut niezabezpieczenia postanowień umownych, które gwarantowałyby prawidłowość wykonania umowy jest bezzasadny. SEI zobowiązało się do kwartalnych sprawozdań dotyczących liczby zdeklarowanych subskrybentów i zasięgu emitowanego programu. Upoważnienie SEI do wykorzystywania różnych technik nadawania sygnału /DBS, system niekodowany, sieci kablowe itp./ dawało TVP S.A. informacje, zgodnie z umową, o wszystkich potencjalnych odbiorcach programu. Dodatkowo wyjaśniam, że pod pojęciem zdeklarowanych subskrybentów programu należy rozumieć wszystkich potencjalnych odbiorców tego programu emitowanego w różnych systemach nadawczych, którzy w odpowiedzi na rozesłaną ankietę przysłali do SEI swoje imię, nazwisko, adres oraz deklarację chęci stałego oglądania programu TV POLONIA. Więc oświadczenie ▇▇▇▇▇▇▇▇▇▇ w tym stanie rzeczy, b.Zarząd TVP S.A. przyjął jako prawdziwe. Umowa między TVP S.A. i SEI jest wynegocjowana na wyjątkowo korzystnych warunkach dla TVP S.A., jest jedyną znaną nam umową, która gwarantuje TVP S.A. otrzymywanie aż 8% z przychodów brutto SEI. Jednocześnie, zgodnie z umową, istnieje możliwość przeprowadzania audytu SEI, a nadto istotnym elementem kontrolnym jest

2

TP3000666

obecność przedstawicieli TVP S.A. w Radach Nadzorczych TVP USA i TVP Kanada.

9. Zarzut dotyczący używania logo TVP przez SEI jest niezasadny, gdyż na terenie USA znak ten nie jest zastrzeżony, zaś SEI używała go w minimalnym zakresie jedynie w korespondencji. Natomiast w emitowanym programie używany był wyłącznie znak graficzny TV POLONIA do czego SEI miało prawo zgodnie z paragrafem 3 pkt.4 umowy.

10. Co do zarzutu dotyczącego braku regularności kwartalnych opłat w 1997 roku należy stwierdzić iż fakt ten wyniknął z powodu sporu na temat zmiany logo TV POLONIA. W wyniku negocjacji TVP USA odstąpiła od swoich roszczeń i uiściła całą należność. Dodać należy, że TV POLONIA miała prawo do zmiany swojego logo na podstawie §9 ust.4 umowy. Zarzut o dopuszczenie do zaległości płatniczych nie może być brany pod uwagę. /wykaz korespondencji z SEI na temat płatności zał.nr .4/.

11. TVP S.A. nie przeprowadziła audytu z uwagi na wysoki koszt oraz zabezpieczenie swoich interesów poprzez udział w Radzie Nadzorczej i otrzymywanie sprawozdań kwartalnych.
Należy zauważyć, że członkostwo w Radzie Nadzorczej gwarantuje wgląd we wszystkie dokumenty finansowe TVP USA i TVP Kanada.
Członek b. Zarządu TVP S.A - ████████ nie stwierdził żadnych nieprawidłowości w TVP USA i podobnie żadnych nieprawidłowości nie stwierdził ████████ jako kolejny oddelegowany do pracy w Radzie Nadzorczej. / w załączeniu sprawozdanie z ████████ posiedzenia Rady Nadzorczej w dniu 25 maja 1998r zał.nr .5./.

12. Zarzut niemożności wypowiedzenia umowy w przypadku naruszenia istotnych jej postanowień nie znajduje uzasadnienia w kontekście treści § 10, ust.2 umowy, który zawiera warunki i procedurę jej wypowiadania. Strony celowo wydłużyły procedurę rozwiązania umowy albowiem ma ona charakter precedensowy, przedsięwzięcie jest kapitałochłonne i czasochłonne. Dlatego wolą stron było trwalsze związanie partnerów umowy.

13. Niezrozumiałym jest zarzut wystąpienia pokontrolnego dotyczący braku koordynacji i nadzoru na realizację postanowień umowy. Dowodem przeciwnej tezy jest bogata i merytoryczna korespondencja pomiędzy stronami umowy, protokoły z posiedzeń Zarządu oraz relacje z wizyt przedstawicieli TVP S.A. w SEI oraz przedstawicieli SEI w TVP S.A.
Całość tej dokumentacji została przekazana w toku kontroli osobom kontrolującym do wglądu. Dyrektorzy jednostek organizacyjnych TVP S.A. złożyli kontrolerom obszerne wyjaśnienia w tej sprawie.

3

14. Nieprawdą jest jakoby brak było „ skoordynowanych działań zmierzających do wykorzystania opinii środowisk polonijnych w USA do odpowiedniego układu ramowego TV POLONIA".
Na wniosek środowisk polonijnych Zarząd TVP S.A. podjął decyzje o całodobowym nadawaniu programy TV POLONIA z wydzieleniem odrębnego pasma adresowanego wyłącznie do widzów amerykańskich.
Program ten test odzwierciedleniem życzeń zawartych w listach od telewidzów amerykańskich. Jednym z najważniejszych źródeł wykorzystania opinii środowisk polonijnych w kreowaniu programu TV POLONIA są osobiste spotkania przedstawicieli TVP S.A. z tymi środowiskami .Pragnę również nadmienić, że w Radzie Programowej TV POLONIA zasiada przedstawicielka Polonii /zał.nr 6/
O fakcie zaangażowania jednostek nadzorujących realizację umowy ze strony TVP S.A. oraz ich znajomości stanu realizacji tejże świadczy dokument p.t. „ Informacja na temat wprowadzenia programu TV POLONIA na teren USA" / zał.nr 7 / przekazany kontrolerom przez dyrektora ■■■■■■■■■■ a nie znajdujący podobnie jak wiele innych dokumentów odzwierciedlenia w wystąpieniu pokontrolnym.

15. Zarzut wyrażony w pkt.9 wystąpienia pokontrolnego dot. niepowodzenia przedsięwzięcia objętego postanowieniami umowy jest niezrozumiały w kontekście faktów opisanych m.in. w niniejszych zastrzeżeniach.
Dodatkowo godzi się zauważyć, że co prawda przychodowa strona przedsięwzięcia odbiega jeszcze od założeń, niemniej sygnał TV POLONIA jest od 1995 roku ogólnie dostępny na terenie Ameryki Północnej, a TVP S.A. nie jest zmuszona angażować w to przedsięwzięcie jakichkolwiek środków finansowych. Istotnym również jest fakt iż co prawda umowa ma charakter handlowy, ale dla TVP S.A. podstawowym celem jej zawarcia jest obecność TV POLONIA na kontynencie amerykańskim bez angażowania własnych środków. Cel ten został osiągnięty.

16. Zarząd TVP S.A. nie był zainteresowany uzyskiwaniem udokumentowanych materiałów źródłowych dot. kosztów realizacji przedsięwzięcia ponoszonych przez kontrahenta umowy, albowiem koszty te w żaden sposób nie dotyczyły TVP S.A.. Natomiast starano się uzyskać szacunkowe dane na ten temat celem zobrazowania oszczędności jakie są udziałem telewizji w związku z realizacją umowy. Dodać trzeba, że koszty ponoszone przez partnera umowy są objęte tajemnicą handlową.

17. Uwagi wystąpienia pokontrolnego odnoszące się do Rady Programowej TV POLONIA są niezrozumiałe, albowiem działalność tejże Rady nie ma żadnego związku z postanowieniami umowy będącej przedmiotem kontroli i nie była objęta jej zakresem tematycznym.
Na marginesie jedynie stwierdzić należy, że Rada Programowa TV POLONIA ocenia bardzo wysoko program TV POLONIA.

18. Odnosząc się do wniosków wystąpienia pokontrolnego stwierdzić należy, że :

4

TP3000668

(356)

- brak jest podstaw do przyjęcia, że interesy TVP S.A. nie zostały należycie zabezpieczone w przedmiotowej umowie.

- nadzór nad realizacją zobowiązań wynikających z umowy był i jest realizowany w sposób ciągły przez stosowne jednostki organizacyjne Spółki, a Zarząd jest sukcesywnie informowany o sprawach wymagających jego akceptacji.

- zgodnie z §4. ust.2 umowy promocją programu TV POLONIA na terenie USA i Kanady i ponoszeniem kosztów tej promocji zajmuje się partner umowy, a TVP S.A. jest o tym informowana w sprawozdaniach kwartalnych.

- przeprowadzenie audytu finansowego korporacji partnera mija się z celem w sytuacji bieżącej informacji o przychodach z tytułu umowy oraz możliwości badania wyników finansowych korporacji przez przedstawicieli TVP S.A. będących członkami Rad Nadzorczych.

- TVP S.A. otrzymała wszystkie należne płatności wynikające z umowy. Nie mają miejsca żadne zaległości płatnicze.

19. W świetle powyższych zastrzeżeń uważam za niezasadne obciążanie Zarządu TVP S.A. oraz ▆▆▆▆▆▆▆▆▆▆ i Dyrektora TV POLONIA ▆▆▆▆▆▆ ▆▆▆▆▆▆▆: „niezadowalający stan realizacji umowy" albowiem większość zarzutów wystąpienia pokontrolnego nie znajduje uzasadnienia w stanie faktycznym. Oceniając realizację umowy kontrolerzy powinni brać pod uwagę charakter przedsięwzięcia, cel umowy, jej społeczne skutki i precedensowy charakter, a także złożoną sytuację na amerykańskim rynku mediów, uważanym za najtrudniejszy rynek na świecie.

Umowa była negocjowana z zachowaniem profesjonalnych reguł w tym zakresie a jej postanowienia należycie zabezpieczają interesy TVP S.A.
W tym stanie rzeczy sugerowanie w wystąpieniu pokontrolnym zastosowanie art.60.ust. 3 ustawy o Najwyższej Izbie Kontroli jest w stosunku do byłego Zarządu TVP S.A. oraz Dyrektora Biura Współpracy z Zagranicą ▆▆▆▆▆▆ oraz Dyrektora TVP POLONIA ▆▆▆▆▆▆▆▆▆ jest nieuzasadnione.

5

TP3000669

## Zastrzeżenia do wystąpienia pokontrolnego Najwyższej Izby Kontroli z dnia 28 lipca 1998 r.

1. Zgodnie z postanowieniem Prezesa NIK przedmiotem kontroli miało być zbadanie „zabezpieczenia interesów telewizji polskiej w umowie na kolportaż programu TV POLONIA w USA i Kanadzie". Tymczasem z wystąpienia pokontrolnego wynika, że kontrola wyszła poza zakres postanowienia o przeprowadzeniu kontroli. Część dokumentów przedkładanych kontrolerom a dotyczących meritum kontroli nie znalazło odbicia w protokole kontroli i w wystąpieniu pokontrolnym.

2. Nieprawdziwe jest stwierdzenie w wystąpieniu pokontrolnym jakoby sygnał TV POLONIA nie był odbierany w Kanadzie. Zarówno na terytorium USA i Kanady sygnał był i jest odbierany w systemie niekodowanym. Na tę okoliczność dyrektor Biura Współpracy z Zagranicą TVP S.A. przekazał pisma wyjaśniające i udostępnił pisemne potwierdzenie tego faktu przez dyrekcję amerykańskiego systemu satelitarnego ORION (kopia pisma dyrekcji ORION - zał. nr .1).

3. Powoływanie się w wystąpieniu pokontrolnym jedynie na opinię Radcy Handlowego RP w Montrealu jest niepełne, tym bardziej, że dyrektor Biura Współpracy z Zagranicą przekazał kontrolerom opinię wywiadowni handlowej Dun and Bradstreet Canada (otrzymaną zresztą za pośrednictwem Jerzego Lipińskiego z Biura Radcy Handlowego w Montrealu) oraz opinię banku Royal Bank, którego klientem jest B.M. Spanski - właściciel firmy SEI. Obie opinie w pozytywnym świetle stawiały firmę SEI jako potencjalnego partnera umowy. Przedstawione kontrolerom życiorysy właściciela SEI oraz członków Zarządów korporacji TVP USA i TVP Kanada świadczą o ich doświadczeniu w świecie mediów. (zał. nr .2).

1

727-731
TP 7005721

4. Zarzut wystąpienia pokontrolnego dotyczący braku zabezpieczenia kontroli TVP S.A. nad zawartością programu emitowanego w Ameryce z udziałem programu TV POLONIA nie uwzględnia świadomie przyjętej koncepcji, aby ze względów handlowych dopuścić możliwość emisji własnych audycji przez SEI przy planowanym udziale TVP S.A. w dochodach SEI z tytułu emitowania programu i reklam. §3 i §9 ust.4 umowy zabezpieczają integralność audycji TV POLONIA i uniemożliwiają ingerowanie SEI w kształt i zawartość tego programu (np. niemożność przerywania audycji reklamami).

5. Stwierdzenia wystąpienia pokontrolnego o utworzeniu korporacji są stwierdzeniami faktu, który w żaden sposób nie odbiega od postanowień umowy.

6. Zarzut niezabezpieczenia postanowień umownych, które dawałyby możliwość prawidłowego wykonania umowy pomija następujące fakty. SEI zobowiązało się do kwartalnych sprawozdań dotyczących liczby zdeklarowanych subskrybentów i zasięgu emitowanego programu. Zgodnie z umową, istnieje możliwość przeprowadzania audytu SEI, a istotnym elementem kontrolnym może być obecność przedstawicieli TVP S.A. w Radach Nadzorczych TVP USA i TVP Canada.

7. Zarzut dotyczący używania logo TVP przez SEI jest niezasadny, gdyż na terenie USA znak ten nie jest zastrzeżony, zaś SEI używała go w minimalnym zakresie jedynie w korespondencji. Natomiast w emitowanym programie używany był wyłącznie znak graficzny TV POLONIA, do czego SEI miało prawo zgodnie z paragrafem 3 pkt.4 umowy.

8. Wobec zarzutu dotyczącego braku regularności kwartalnych opłat w 1997 roku należy stwierdzić iż fakt ten wyniknął z powodu sporu na temat zmiany logo TV POLONIA. W wyniku negocjacji TVP USA odstąpiła od swoich roszczeń i uiściła całą należność. TV POLONIA miała prawo do zmiany swojego logo na podstawie §9 ust.4 umowy. Zarzut o dopuszczenie do zaległości płatniczych nie powinien

2

TP 7005722

być brany pod uwagę z uwagi na ~~wykaz korespondencji za SEI na temat płatności~~ (zał. nr .3).

9. TVP S.A. nie przeprowadziła audytu z uwagi na wysoki koszt oraz wystarczające, w ocenie przedstawicieli TVP S.A., zabezpieczenie interesów TVP S.A. poprzez ich udział w Radach Nadzorczych i otrzymywanie sprawozdań kwartalnych. Były członek Zarządu TVP S.A Adam Brodziak nie stwierdził żadnych nieprawidłowości w TVP USA i podobnie żadnych nieprawidłowości nie stwierdził Jerzy Romański jako kolejny oddelegowany do pracy w Radzie Nadzorczej TVP USA. (sprawozdanie J. Romańskiego z posiedzenia Rady Nadzorczej w dniu 25 maja 1998r zał. nr .4).

10. Zarzut wystąpienia pokontrolnego dotyczący braku koordynacji i nadzoru nad realizacją postanowień umowy nie uwzględnia bogatej korespondencji pomiędzy stronami umowy, protokołów z posiedzeń Zarządu oraz relacji z wizyt przedstawicieli TVP S.A. w SEI oraz przedstawicieli SEI w TVP S.A. Całość tej dokumentacji została przekazana w toku kontroli osobom kontrolującym do wglądu. Dyrektorzy jednostek organizacyjnych TVP S.A. złożyli kontrolerom obszerne wyjaśnienia w tej sprawie.

11. Co do zarzutu o braku „skoordynowanych działań zmierzających do wykorzystania opinii środowisk polonijnych w USA do odpowiedniego układu ramowego TV POLONIA, należy zwrócić uwagę, że właśnie na wniosek środowisk polonijnych Zarząd TVP S.A. podjął decyzje o całodobowym nadawaniu programy TV POLONIA z wydzieleniem odrębnego pasma adresowanego wyłącznie do widzów amerykańskich. Program ten test odzwierciedleniem życzeń zawartych w listach od telewidzów amerykańskich. Jednym z najważniejszych źródeł wykorzystania opinii środowisk polonijnych w kreowaniu programu TV POLONIA są osobiste spotkania przedstawicieli TVP S.A. z tymi środowiskami. W Radzie Programowej TV POLONIA zasiada przedstawicielka Polonii. (zał. nr 5) O fakcie zaangażowania jednostek nadzorujących realizację umowy ze strony TVP S.A. oraz ich znajomości stanu

3

realizacji tejże świadczy dokument p.t. „Informacja na temat wprowadzenia programu TV POLONIA na teren USA" (zał. nr 6) przekazany kontrolerom przez dyrektora Jerzego Romańskiego.

12. Zarzut wyrażony w pkt. 9 wystąpienia pokontrolnego dotyczący, niepowodzenia przedsięwzięcia objętego postanowieniami umowy nie uwzględnia faktu, że sygnał TV POLONIA jest od 1995 roku ogólnie dostępny na terenie Ameryki Północnej, a TVP S.A. nie jest zmuszona angażować w to przedsięwzięcie jakichkolwiek środków finansowych. Istotny dla TVP S.A. cel zawarcia umowy polegający na obecności TV POLONIA na kontynencie amerykańskim bez angażowania własnych środków został osiągnięty.

13. W opinii m.in. dyr. Romańskiego, Zarząd TVP S.A. nie był w poprzedniej kadencji zainteresowany uzyskiwaniem udokumentowanych materiałów źródłowych dotyczących kosztów realizacji przedsięwzięcia, ponoszonych przez kontrahenta umowy, albowiem koszty te nie dotyczyły TVP S.A. Natomiast starano się uzyskać szacunkowe dane na ten temat celem zobrazowania oszczędności jakie są udziałem telewizji w związku z realizacją umowy.

14. Uwagi wystąpienia pokontrolnego odnoszące się do Rady Programowej TV POLONIA są niezrozumiałe, albowiem działalność tejże Rady nie ma związku z postanowieniami umowy będącej przedmiotem kontroli i nie była objęta jej zakresem tematycznym. Na marginesie można stwierdzić, że Rada Programowa TV POLONIA wysoko ocenia program TV POLONIA.

15. Odnosząc się do wniosków wystąpienia pokontrolnego stwierdzić należy, że:

  ■ zgodnie z §4 ust. 2 umowy promocją programu TV POLONIA na terenie USA i Kanady i ponoszeniem kosztów tej promocji zajmuje się partner umowy, a TVP S.A. jest o tym informowana w sprawozdaniach kwartalnych,

4

TP 7005724

- przeprowadzenie audytu finansowego korporacji partnera mija się z celem w sytuacji bieżącej informacji o przychodach z tytułu umowy oraz możliwości badania wyników finansowych korporacji przez przedstawicieli TVP S.A. będących członkami Rad Nadzorczych,

- TVP S.A. otrzymała należne płatności wynikające z umowy i nie mają miejsca zaległości płatnicze,

- Oceniając realizację umowy kontrolerzy powinni również brać pod uwagę charakter przedsięwzięcia, jej społeczne skutki i precedensowy charakter, a także złożoną sytuację na amerykańskim rynku mediów, uważanym za najtrudniejszy rynek na świecie,

- wnioski kadrowe sugerowane w wystąpieniu pokontrolnym wymagają głębszej, merytorycznej analizy.

CZŁONEK ZARZĄDU
TELEWIZJA POLSKA S.A.
Jarosław Pac......



5

TP 7005725