# EXHIBIT 6

```
00001
  1

  2

  3        UNITED STATES DISTRICT COURT

  4        SOUTHERN DISTRICT OF NEW YORK

  5
     SPANSKI ENTERPRISES, INC. )
  6  and POLTEL INTERNATIONAL )
     L.L.C.,                )
  7                         )
        Plaintiffs and      )
  8  Counterclaim Defendants, )
                            )
  9     vs.       ) No. 07 CIV 930
                  )    (GEL)
 10  TELEWIZJA POLSKA, S.A., )
     ANNA MILEWSKA, KRZYSZTOF )
 11  SZTANDERA, MARCIN    )
     BOCHENEK, JOHN DOES 1-10, )
 12                         )
        Defendants and     )
 13  Counterclaim Plaintiffs, )
                            )
 14     vs.         )
                    )
 15  TELEWIZJA POLSKA U.S.A. )
     INC., TELEWIZJA POLSKA   )
 16  CANADA INC. and BOGUSLAW )
     M. SPANSKI,        )
 17                    )
     Counterclaim Defendants. )
 18  --------------------------)

 19

 20        DEPOSITION OF DAVID YURKERWICH

 21           New York, New York

 22           June 30, 2008

 23

 24  Reported by:
     PAMELA J. MAZZELLA, RPR
 25  JOB NO. 203840
```

00075

1

2 analysis?

3   A.   The sale of the subscription by the

4 programmers is what is relevant to my

5 analysis.

6   Q.   And the revenues received by

7 Spanski, do they have any relevance to your

8 analysis?

9   A.   No.

10   Q.   Has that always been your position?

11   A.   It's always been my assumption with

12 respect to the agreement.

13   Q.   What assumptions did you make in

14 connection with your analysis of the

15 relationship between TVP and Spanski

16 Enterprises?

17   A.   Well, for purposes of calculating

18 damages I assumed that the subscription

19 revenues were the base that should have been

20 used in calculating the payments due to TVP.

21   Q.   Anything else?

22   A.   I also assumed that it was

23 inappropriate for Mr. Spanski to allocate any

24 portion of the subscription revenue to radio.

25   Q.   With whom, if anyone, did you

```
00076
 1
 2  discuss your assumption that the subscription
 3  revenues received by cable and satellite
 4  distributors was the relevant base?
 5      A.  Counsel for TVP.
 6      Q.  Which counsel?
 7      A.  Mr. Skulnik, Mr. Mattiaccio, and
 8  Ms. Haverstick.
 9      Q.  Had you ever discussed the
10  assumption with Mr. Jacobs?
11      A.  Yes.
12      Q.  And what did you discuss with Mr.
13  Jacobs?
14      A.  The same assumption.
15      Q.  May I have more details, please, of
16  that discussion?
17      A.  As best I can recall, we discussed
18  the agreement and the appropriate base for
19  the payments to be made to TVP.
20      Q.  And did Mr. Jacobs instruct you one
21  way or the other as to what the -- as to make
22  the assumption of the appropriate royalty
23  base?
24      A.  I don't recall.  I don't recall
25  that.
```

00093

1

2  assumption, how much is due to TVP?

3      A.  It would be 800,000 unless there

4  was some dispute.  I guess it would be a

5  function of who bore the risk of the dispute.

6      Q.  And it is your understanding that

7  whether or not Spanski actually got paid was

8  a factor to be considered in what was due to

9  TVP?

10     A.  I don't know that.  I'm simply

11  telling you that I tried to figure out

12  whether he was paid on the revenues that I

13  have included as subscription revenues.

14     Q.  You also testified a little bit ago

15  that you assumed that it was inappropriate

16  for Spanski Enterprises to have allocated any

17  revenue to licensing of radio programs,

18  correct?

19     A.  Yes.

20     Q.  Who instructed you to make that

21  assumption?

22     A.  Counsel.

23     Q.  And is that Mr. Skulnik and his

24  colleagues?

25     A.  Yes.

00094
1
2   Q.  Was that ever discussed with Mr.
3 Jacobs?
4   A.  It might have been at one time.
5   Q.  What specifically were you
6 instructed with respect to the radio
7 assumption?
8   A.  To assume that no allocation should
9 be made.
10   Q.  And when were you given that
11 instruction?
12   A.  Some time before I prepared my
13 report.
14   Q.  Was it a matter of days, weeks,
15 months, hours?
16   A.  Somewhere between weeks and months.
17 Probably months.
18   Q.  Now, what impact, if any, did
19 incorporating that assumption into your
20 analysis have on your analysis?
21   A.  Well, it causes damage.
22   Q.  What do you mean?
23   A.  Well, since Mr. Spanski did not pay
24 the 8 percent on the full amount that was
25 collected by the programmers, it creates a

00095

1

2 difference.

3   Q.  Does it increase or decrease the

4 number on your report?

5   A.  It creates damage, so it increases

6 it.

7   Q.  Did you make any effort to analyze

8 allocation practices in the cable and

9 satellite industry?

10   A.  Well, I reviewed the agreements

11 that are, have been produced in this case.  I

12 analyzed the agreements that have been

13 produced in this case.

14   Q.  Before or after you were instructed

15 to assume no value for the radio?

16   A.  I don't know.  Probably before, but

17 I don't recall.

18   Q.  So for the purposes of the

19 analysis, the radio component of this, it was

20 irrelevant to you, in light of the

21 assumption, whether distributors in fact

22 placed a value on that content?

23   A.  I wouldn't say that, no.  I

24 wouldn't say it was irrelevant.

25   Q.  What relevancy did it play in your

00096

1

2  analysis?

3     A.  It appeared to me to be a proper

4  assumption based on the information that I

5  examined.

6     Q.  And the assumption that appeared to

7  be proper to you was that -- let me make sure

8  I have the exact concept.  Tell me again.

9     A.  That no revenue should be allocated

10  to radio and excluded from the 8 percent

11  calculation.

12     Q.  I want to be very clear about this,

13  it is important.

14        Is it your expert opinion that no

15  revenue should be allocated to radio revenue

16  and excluded from the 8 percent calculation,

17  or is that an assumption that you made in

18  preparing this report?

19     A.  I believe it's an assumption that I

20  made in connection with --

21     Q.  I'm sorry, I can't have an I

22  believe.  It has to be yes or no.

23     A.  It's an assumption that I found to

24  be reasonable.

25     Q.  We're going to do this again.

```
00099
 1
 2    A.  I don't think I could give that
 3  exact opinion because it does involve
 4  interpreting the contract.
 5    Q.  And it also involves, for example,
 6  whether TVP agreed or didn't agree to permit
 7  allocation, correct?
 8    A.  I think that falls under the
 9  interpreting the contract subject.  That's
10  part of a contract interpretation I think.
11    Q.  And you didn't make any effort to
12  find out from TVP what their expectations
13  were with respect to allocation of radio
14  revenue, did you?
15    A.  I did not interview TVP about that,
16  no.
17    Q.  Did you ask Mr. Skulnik to provide
18  you any information about what TVP thought of
19  it?
20    A.  I recall discussing with Mr.
21  Skulnik.  I guess I don't recall asking him
22  what they said to him.
23    Q.  Did you make any other assumptions
24  in preparing your report, other than the two
25  you have mentioned, told me about just now?
```